**Lynn MARTIN, Secretary of Labor, United States Department of Labor, sub nom., Elizabeth Dole, Secretary of Labor, United States Department of Labor, Plaintiff,**

**v.**

**STATE OF WYOMING, Wyoming Game and Fish Commission as Director and Supervisor of Wyoming Game and Fish Department, Defendants.**

No. 90–CV–0195–B.

United States District Court,
D. Wyoming.

Aug. 13, 1991.

Katherine Vigil, U.S. Dept. of Labor, Office of the Sol., Denver, Colo., for plaintiff.

Bruce A. Salzburg, Herschler, Freudenthal, Salzburg, Bonds & Rideout, P.C., Cheyenne, Wyo., defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIMMER, Chief Judge.

This matter was presented in a trial to the Court on the twenty-fourth day of June, 1991. The Court, having heard the testimony of the witnesses, having considered the other evidence presented, having heard and considered the legal arguments of counsel, and being fully advised in the premises, hereby enters the following FINDINGS OF FACT AND CONCLUSIONS OF LAW:

**614**

### Findings of Fact

*I. The Wardens' Claim:*

1. The Wyoming Game and Fish Department is the State agency charged with protection, preservation, and management of the State's wildlife resource. The Department is an administrative agency of the State, and is governed by an appointed Game and Fish Commission, which is comprised of citizens chosen from various Game and Fish districts within the State.

2. The Department receives its income solely from hunting and fishing license fees and Federal cooperative funding. The Department receives no financial support from the State's general fund.

3. Wyoming's approximately 98,000 square miles are divided by the Department into seven Supervisor Districts, and forty-seven game warden districts. Generally, each Supervisor District is staffed by a supervisor, several game biologists, habitat biologists, support staff, and two wardens working from the district office. Prior to 1989, these two wardens were designated as district damage control warden and district enforcement specialist. Despite their titles, damage control wardens and enforcement specialists possess all the powers and duties of the district game wardens except the overall responsibility for game and fish management within a particular game warden district. The damage control warden assists the game wardens within the Supervisor District with any complex wildlife damage problem. The enforcement specialists concentrate their efforts on particular wildlife law enforcement problems within the Supervisor Districts. Since 1989, damage control wardens, enforcement specialists, and district game wardens are all designated simply as game wardens under the State's position classification system.

4. In addition to the wardens assigned to the Supervisor District Offices, there are forty-seven district game wardens stationed throughout the State. These district game wardens are provided with a house in the city or town in which they live, which also serves as the Game and Fish Department office in that particular game warden district. The houses are provided and maintained by the State, and the State pays all expenses, including utilities, upkeep and repair, and all insurance. The district game wardens are required to live in these houses.

5. Additionally, the State provides one telephone line to each house, and the number is listed in the local directory under the Wyoming Game and Fish Department, as well as the warden's name. District game wardens are permitted to have an additional private telephone line at their own expense.

6. District game wardens operate within their districts with a minimum of supervision. All wardens in a Supervisor District meet periodically, and prepare general work-plans on a yearly basis. Otherwise, the district game wardens perform their tasks with relative autonomy. There are no set hours of work, and each warden is free to choose what he will do, when he will do it, and how much time he will spend on it during any given day.

7. The position of game warden is difficult to obtain. Once each year the Department offers a competitive exam for the warden position, and since February, 1989 it has received two hundred and sixty-eight applications. During this time, only ten permanent employees were hired. The exam consists of a written test, oral examination, and a psychological profile. After the exam, those few applicants who are eligible for hiring are placed on a waiting list pending a position opening.

8. Since approximately 1965, applicants for the game warden position must have obtained, at a minimum, a baccalaureate degree in wildlife management, wildlife biology, or a closely related field. Several wardens currently employed by the Department have completed wildlife degrees at the masters level.

9. A few of the wardens who began their careers prior to 1965 do not possess academic degrees. The change in the requirements for the position of game warden are accurately summarized in the fore-

word of the 1975 Wyoming Game Warden Manual:

> For many years a Wyoming game warden's role in wildlife management was considered to be limited to enforcement work. In many of our towns and villages wardens were called, among other things, "lawmen".
>
> When wildlife management became a professional reality, the assigned activities of the game warden were expanded to include management work, in addition to enforcement duties.
>
> During the past several years emphasis has been placed on the need for public relations, more intensive management and research. The straight enforcement man of yesterday has become an old-fashioned fellow in sophisticated wildlife circles.
>
> Without a doubt, wildlife management has undergone extreme change. Public relations and technical endeavor have become absolute requirements in every warden's daily assignments, but it is folly to assume there is no longer a need for law enforcement in modern management.

Defendants' Ex. H, p. i.

10. Currently, the curriculum for the baccalaureate degree of wildlife conservation and management at the University of Wyoming is described as follows:

> The Wildlife and Fisheries Biology and Management curriculum leads to a B.S. degree in wildlife conservation and management. The degree is designed to develop an appreciation for the cultural, recreational, economic and ecological value of our fisheries and wildlife resources and to train students for positions in management, research, and law enforcement. It is a professional degree within the College of Arts and Sciences.

University of Wyoming, General Bulletin, 1990–91, Defendants' Ex. M, p. 157.

To obtain a B.S. degree in wildlife conservation and management at the University of Wyoming, one must complete 128 semester hours, with an emphasis on biology, zoology, botany and other physical sciences.

11. After being hired by the State, each game warden is required to attend and successfully complete ten (10) weeks of basic law enforcement training at the Police Academy in Douglas, Wyoming.

12. All game wardens are certified peace officers within the State of Wyoming, and they have primary responsibility for enforcing the State's game and fish laws and regulations. Each has been granted arrest powers for violations of the game and fish laws, as well as the power to arrest for a felony committed in his presence. In smaller towns in remote areas of the State, the game wardens may be asked to assist the local deputy sheriff, police officer or highway patrolman in the general enforcement of the State's criminal laws.

13. All game wardens must complete forty (40) hours of additional law enforcement training every two years to retain their status as certified peace officers.

14. All wardens are provided with certain vehicles, equipment and tools in order to perform their jobs. All game wardens and damage control wardens have a 4-wheel drive pickup truck containing Game and Fish insignia and a large tool box, a police radio, red lights, siren and public address system. A few trucks also have a winch. Some wardens are provided with snowmobiles, all-terrain vehicles, and power boats. Additionally, some wardens own horses which they use on the job, and the State pays the wardens rent for the use of these horses.

15. All wardens are provided with a handgun and shotgun, ammunition, speed loader, handcuffs, and body armor. Some wardens also use their own firearms to perform their duties. Most wardens are given binoculars, spotting scopes, tents, sleeping bags, and other camping gear to perform their jobs.

16. The duties assigned to the wardens are extremely diverse. The district game warden's principal function within his district is the management of the wildlife resource; however, this broad function encompasses a great variety of tasks.

The State uses a population-based approach to the management of the wildlife resource. Specifically, each herd area is managed according to a system which seeks to obtain and preserve an optimum population of game animals. This optimum population varies with the specific area, and depends on several variable factors such as the carrying capacity of the habitat, the presence or absence of conflicting uses of the habitat, and the amount of wildlife desired by the public for both consumptive and non-consumptive use. The district game wardens are primarily responsible for calculating the desired population levels of the various species within the district based upon these factors.

As regards the carrying capacity of the habitat, the district game wardens are responsible for observing the amount, variety and health of the plant-life within the district, the amount and kind of cover for the wildlife species in the district, and all other factors necessary in assessing the ability of the land to support a healthy population of the wildlife species present.

As regards the conflicting uses of the habitat, the district game warden is responsible for assisting private landowners with depredation problems caused by wildlife. This includes recommending remedial measures to control depredation, and assessing damage to private property caused by wildlife.

17. In all instances except where the game warden district encompasses a Supervisor District office, the district game warden is the first line of contact between the Department and the public. In this respect, the district game wardens are responsible for public relations. They carry out the policy set by the Game and Fish Commission regarding game and fish management in their district, and initiate policy to resolve management problems, subject to ultimate review and approval by the Department and the Commission.

18. The tasks which the wardens perform on a weekly basis are highly seasonal and depend upon the geography and presence or absence of farming or ranching.

During the fall big game hunting seasons, the wardens spend a great deal of time enforcing the game and fish laws and regulations. This enforcement involves long working hours, as the wardens must travel each day to and from the remote areas where big game hunting is occurring, which are sometimes inaccessible by motor vehicle.

During the winter, in agricultural areas, emphasis may shift to damage control when the migratory game herds move to lower altitudes in search of feed.

In the spring and summer, in areas which include fisheries, emphasis shifts from game to fish enforcement. In the summer, game wardens study population and habitat in order to establish the big game population goals and the subsequent hunting seasons.

During the entire year, the game wardens are involved in public education programs in the schools, a variety of game and nongame wildlife studies, gathering and analyzing data needed for setting the fall hunting seasons, and several other game and fish management problems.

19. The Department uses a Program–Project Cost Accounting System (PPCAS). The sole purpose of PPCAS is to allocate the costs of the particular functions conducted by the Department; it is not intended or used as a means of calculating salary. The PPCAS system includes ninety-two (92) separate activity codes to which employee time is reported, and all game wardens are required to report their time under these activity codes.

20. By general group, the PPCAS activity codes include: acquisition of property and facilities (010–036); administrative and clerical functions (100–145); public communications and in-service training (150–180); development of facilities and habitat (210–290); enforcement (300–320); maintenance (410–490); surveys, investigations, and inventories (500–570); wildlife and damage control (600–630); wildlife propagation, transportation, and feeding (710–730); leave (810–830); and, non-wildlife related functions (905–999). This last series includes enforcement of watercraft safety

laws, search and rescue operations, and assisting other law enforcement agencies.

21. Game wardens report their time using Daily Activity Reports (DAR). Prior to July 1, 1990, Department employees reported their time on the DARs by half-day increments; thereafter, employees, including wardens, have reported to the system on an hourly basis.

22. The wardens' most frequently reported activity codes are in the 100, 300, 400, 500, and 600 series. However, the reported activity codes do not often fully reflect the tasks done. While engaged in routine patrol or enforcement duties, for instance, the wardens observe the habitat within their districts, observe the numbers and location of wildlife species, make public relations contacts with the landowners within their districts, collect harvest information, and discuss Departmental goals and objectives with the sporting public.

23. Furthermore, the majority of the wardens who testified indicated that they "lump" their time into the one or two codes which, in their minds, generally describes the daily activity. Frequently, a warden will code his time based on his subjective intent, as opposed to what tasks he actually accomplished during a particular day. Additionally, all the wardens testified that they fill out their DARs not at the end of each day, but rather at the end of each month. As a result, the codes reported are frequently not an accurate description of the tasks which the wardens perform.

23a. It is undisputed that the wardens often work more than forty (40) hours each week, although there is significant variation in how many hours each warden may work. This variation depends on a variety of factors, including the geography of the warden district, weather, the number and kinds of wildlife species within the district, the length of the hunting and fishing seasons established within the district, the human population of the district, the time of year, and others.

24. Wardens are paid a monthly salary as established by the State compensation and classification system. For the time period relevant in this case, the minimum salary for a new warden, designated by the State as a warden trainee, was in excess of two hundred and fifty dollars ($250.00) per week. The highest paid wardens during the relevant time period earned six hundred and seventy nine dollars ($679.00) per week.

*II. The Spouses' Claim:*

25. As mentioned above, the warden stations are also the residence of the wardens and their families. The wardens and their families may use the State-provided telephone for their personal use, or they may have a personal line installed to the station at their own expense.

26. Most wardens elect not to have a personal line installed. As a result, in those situations where the warden is married, the warden's spouse may answer the telephone and take business messages for the warden when he is out of the station.

27. Additionally, the wardens' spouses may answer the door and provide information when members of the public come to the station for business purposes.

28. Most warden stations receive several calls and visits from the public each week. The calls may concern enforcement problems, damage problems, season openings, license applications, hunting area descriptions or boundaries, or law and enforcement questions. The visits from the public are generally to seek directions, obtain copies of regulations, purchase licenses and game tags, or leave injured animals or animals to be tagged.

29. These calls and visits may occur at any time of day, and frequently occur early in the morning or late in the evening, and on week-ends, especially during hunting season. These calls and visits may be handled by the wardens' spouses.

30. Although most wardens are provided answering machines by the Department, most choose not to use them.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and the

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*

*I. The Wardens' Claim:*

■ 2. The Wyoming Game and Fish Department is an enterprise as defined by Sections 3(r) and 3(s)(1)(C) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* The State of Wyoming, acting through the Department and the Commission, is an employer as that term is used in the Act.

■ 3. The Secretary has promulgated rules and regulations for the appropriate interpretation and application of FLSA, and these interpretations are entitled to deference by this Court. *Rachal v. Allen*, 376 F.2d 999 (5th Cir.1967); *Fanelli v. United States Gypsum Co.*, 141 F.2d 216 (2nd Cir.1944).

■ 4. The burden is on the employer to prove an exemption to FLSA, and these exemptions are to be narrowly construed. *Mitchell v. Lublin, McGaughy & Assoc.*, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959); *Abshire v. County of Kern*, 908 F.2d 483 (9th Cir.1990).

5. 29 U.S.C. § 207 provides, in pertinent part:

> (a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

6. 29 U.S.C. § 213 provides that the overtime provisions of the Act, noted above, do not apply to employees "employed in a bona fide executive, administrative, or professional capacity."

■ 7. The exemption to coverage under the Act for "professional" employee applies to any employee:

> (a) Whose primary duty consists of the performance of:
>
> (1) Work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes; ... and
>
> (b) Whose work requires the consistent exercise of discretion and judgment in its performance; and
>
> (c) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and
>
> (d) Who does not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in paragraphs (a) through (c) of this section; and
>
> (e) Who is compensated for services on a salary ... basis of not less than $170 per week.

29 C.F.R. § 541.3.

8. The regulations provide a "short test" for the professional exemption which exempts employees who earn at least $250 per week and whose primary duty consists of work described in subsection (a)(1), above, and whose work requires the consistent exercise of independent judgment and discretion. *Id.*

9. The Secretary's interpretive regulations make clear that the term "professional" is not limited to the traditional "professions", such as law or medicine. The regulations specifically include professions in "various types of physical ... and biological sciences." 29 C.F.R. § 541.302.

10. Additionally, the Secretary's regulations note that the professional exemption may apply to a particular employee who has not obtained a formal degree. For example, the professional exemption applies to "the occasional lawyer who has not gone to law school, or the occasional chem-

ist who is not the possessor of a degree in chemistry, etc." 29 C.F.R. § 541.302(d).

11. As regards the "primary duty" requirement of 29 C.F.R. § 541.304, if more than 50% of the employee's time is spent engaged in the particular duty, it is his or her primary duty. However, even though the employee does not spend more than 50% of his or her time in one discrete function or task, other factors should be considered in determining the "primary duty" of the employee. For exemption purposes, these include the relative importance of the duty under consideration as compared to the other duties of the employee, the frequency with which the employee exercises discretionary powers, and his relative freedom from supervision.

12. In this case, the evidence demonstrated that the primary duty of the Wyoming game warden is to protect, conserve, and manage the State's wildlife resource. As the PPCAS activity codes indicate, a warden's job consists of several discrete tasks; however, all of the warden's day-to-day activities are directly related to the primary function of managing wildlife. The fact that the Wyoming game warden spends a significant amount of time enforcing the State's game and fish laws does not alter his primary function as a wildlife manager.

13. The evidence further demonstrated that the vast majority of the game wardens acquired the knowledge necessary to perform their primary management duty through prolonged academic study at the college level. Only those few wardens who joined the Department prior to 1965 do not have degrees, and these wardens are clearly the exception.

14. A professional employee must also consistently exercise discretion and independent judgment in the performance of his or her duties. 29 C.F.R. § 541.305. This description typifies the Wyoming game warden, who must exercise discretion and independent judgment in virtually every hour of every day. Aside from the guidance provided by the annual workplans prepared in each supervisor district, wardens operate essentially without direction, and are free to determine what they will do and when.

15. The professional employee's work is "predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.306. While some of the work which the wardens perform is undoubtedly repetitious, this fact does not remove the work from the professional exemption. *Id.* Obviously, some professionals are required to perform repetitious or manual tasks as part of their duties. An attorney might use a word processor or drive a car. Similarly, a warden might use a 4–wheel drive pickup and a spotting scope to survey wildlife. To hold that such incidental manual tasks destroy one's professional status would be both absurd and contrary to the regulation's intent.

16. The "short test" for the professional exemption requires the State to show that the wardens' primary duty consists of work described in 29 C.F.R. § 541.3(a)(1), i.e., work requiring knowledge of an advanced type in a field of science, and which requires the consistent exercise of discretion and judgment, and that they are salaried at least two hundred and fifty dollars ($250.00) per week. The evidence presented in this case demonstrates that the State has met this burden, and all of the wardens at issue in this case meet these requirements for exemption from the Act's coverage.

17. The Court concludes that the Wyoming game wardens' primary duty consists of work in a field of science requiring knowledge and learning of an advanced type, requiring the consistent exercise of independent judgment and discretion, and which is predominantly intellectual and varied. Additionally, the wardens do not spend more than 20% of their time on tasks which are not an essential part of and necessarily incident to the professional tasks.

18. On the basis of the evidence presented, the Court concludes that the position of Wyoming game warden is exempt from the overtime provisions of FLSA, as the wardens meet the bona fide

professional exemption contained in the Act, 29 U.S.C. § 213, and the regulations promulgated by the Secretary, 29 C.F.R. § 541.3.

## II. The Spouses' Claim:

19. The Department has never expressly asked or required a game warden's spouse to answer the door or the telephone, or to give out public information at the warden station. Some spouses choose to do so, others decline. The decision to do so is one that is left up to the warden and his or her spouse. There is no agreement of any sort between the spouse and the Department, and to the extent that spouses do provide this service, it is on a strictly volunteer basis.

20. The Department has issued all district game wardens an answering machine, and encourages them to use it. Some wardens use these devices, but most testified that it was more convenient for them to answer the phone themselves or allow their spouse to do so. Again, this is a matter for the couple to decide as they see fit.

21. At trial, the Secretary emphasized the amount of assistance provided by the spouses. However, the frequency or amount of such assistance is irrelevant. The determinative question here is whether the Department ever established either an express employment relationship with the spouses, or suffered them to work under circumstances which would imply an obligation to pay them. The evidence shows that the Department did neither.

22. Under 29 U.S.C. § 203(g), if one is suffered or permitted to work, he is "employed" under FLSA. The Secretary claims that the wardens' spouses are suffered or permitted to work by the Department, and thus are entitled to compensation. Given the weight of the evidence presented in this case, there is little law in this or other circuits which supports the Secretary's claim.

*Donovan v. Hudson Stations, Inc.*, 99 Lab. Cases ¶ 34,463, 1983 WL 2110 (D.C.Kan.1983) and *Brennan v. Ray Stern Inv. Corp. dba Wedgewood Tower Apart-*

*ments*, 375 F.Supp. 705, 74 Lab. Cases ¶ 33,108 (N.D.Tex.1974) best support the Secretary's position. In each case, the district court summarily found that the employer had allowed the spouse of an employee to work, and thus was liable under the FLSA, but provided little rationale for its decision.

This Court finds the "economic reality test" articulated by the Fifth Circuit to be far more compelling. This test looks to whether the alleged employer a) has the power to hire and fire the employee, b) has supervised or controlled the employee's work schedule or conditions of employment, c) determined the method and rate of payment, and d) maintained employment records. *Watson v. Graves*, 909 F.2d 1549 (5th Cir.1990); *see also, Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508 (5th Cir.1969), citing, *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961). Not one of these requirements is present in this case. The Department can not fire the spouse of a warden, it can not supervise or control her, it does not pay her, and it of course has no employment records for her. This Court therefore concludes that the spouse of the Wyoming district game wardens have not been suffered or permitted to work by the Department, and thus are not employees entitled to compensation under the FLSA.

THEREFORE IT IS

ORDERED AND ADJUDGED that the plaintiff's complaint be, and the same hereby is, dismissed with prejudice. It is further

ORDERED that each party shall bear their own costs.