993 F.2d 739
 61 USLW 2779, 125 Lab.Cas. P 35,817,
1 Wage & Hour Cas.2d (BNA) 649
 Robert REICH, Secretary of Labor, United States Department
of Labor, Plaintiff-Appellant/Cross-Appellee,
v.
STATE OF WYOMING, Wyoming Game and Fish Commission as
Director and Supervisor of Wyoming Game and Fish
Department, Defendants-Appellees/Cross-Appellants.
 Nos. 91-8069, 91-8070.
 United States Court of Appeals,
Tenth Circuit.
 May 11, 1993.
 
 Marshall J. Breger (Monica Gallagher, William J. Stone and Paul L. Frieden with him on the brief), of U.S. Dept. of Labor, Washington, DC, for plaintiff-appellant.
 Bruce A. Salzburg (Joseph B. Meyer and Ron Arnold with him on the brief), of Herschler, Freudenthal, Salzburg, Bonds & Rideout, of Cheyenne, WY, and as Sp. Asst. Atty. Gen., for defendants-appellees.
 Before LOGAN, SEYMOUR, and BROWN,* Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 Robert Reich, Secretary of Labor, brought this suit under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 207 and 215(a)(2) (1988), against the State of Wyoming Game and Fish Commission alleging that the state game wardens were not properly paid overtime for hours worked in excess of forty hours per week. The district court found that the Wyoming game wardens are exempt from the Fair Labor Standards Act under the professional exemption. Martin v. Wyoming, 770 F.Supp. 612, 619-20 (D.Wyo.1991).[1] The Secretary appeals, and we affirm.
 
 I.
 
 2
 The Secretary sued to recover overtime pay for state game wardens.[2] The district court applied the "short test" for the professional exemption promulgated by the Secretary of Labor, see 29 C.F.R. § 541.3, and concluded that the game wardens were exempt from the overtime provisions of the FLSA. Martin, 770 F.Supp. at 619. The court found that the wardens' primary duty consists of work in a field of science that requires knowledge and learning of an advanced type and the consistent exercise of independent judgment and discretion, and that this duty is predominantly intellectual and varied. Id. The court determined further that the wardens do not spend more than twenty percent of their time on "tasks which are not an essential part of and necessarily incident to the professional tasks." Id.
 
 
 3
 The Secretary asserts that the state failed to carry its burden of establishing the game wardens as professionals within the exemption because the state did not meet the three prerequisites set forth in the Secretary's regulation. The Secretary thus contends that the position of game warden does not have a recognized status as a "profession", that the state required degree in wildlife management is not necessary to perform the duties of a game warden, and that the wardens do not consistently exercise the requisite discretion and independent judgment in matters of consequence necessary to qualify for the exemption.
 
 II.
 
 4
 Exemptions to the FLSA are to be narrowly construed; the employer must show the employees fit "plainly and unmistakenly within [the exemption's] terms." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); Abshire v. County of Kern, 908 F.2d 483, 485 (9th Cir.1990). "The question of how the [game wardens] spen[d] their time ... is a question of fact [which we review under the clearly erroneous standard]. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law" which we review de novo. Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986). See also Drollinger v. Arizona, 962 F.2d 956, 958 (9th Cir.1992); Bratt v. County of Los Angeles, 912 F.2d 1066, 1068 (9th Cir.1990). Upon a careful review of the record, we conclude that the district court's findings of fact are not clearly erroneous and that the Wyoming game wardens meet the requirements of the FLSA professional exemption.
 
 
 5
 The record reveals the following undisputed facts. The state of Wyoming is divided into seven supervisory districts each of which is staffed by a supervisor, game and habitat biologists, and two wardens. The supervisory districts are further divided into forty-seven warden districts throughout the state. One district game warden in each warden district is responsible for approximately 2000 square miles. The state provides each district warden with a telephone and house which also serves as the warden's office; all expenses are paid and the warden is required to live there. The game wardens in each supervisory district meet periodically to establish yearly work schedules. They otherwise work with relative autonomy in performing their day-to-day tasks.
 
 
 6
 All game wardens are required to have a baccalaureate degree in wildlife management, wildlife biology, or a closely related field. Such curriculums contain emphasis on biology, zoology, botany, and other physical sciences. Additionally, the wardens must have ten weeks of basic law enforcement training before starting, and forty hours every two years once they begin. The salaries range from two hundred and fifty dollars per week to six hundred and seventy-nine dollars per week.
 
 
 7
 Both parties agree that the applicable test to determine whether the game wardens satisfy the professional exemption is the so-called "short test". The employee must first meet a minimum salary requirement of two hundred and fifty dollars per week. 29 C.F.R. § 541.3(e) (1992). The test then provides:
 
 
 8
 [An] employee employed in a bona fide * * * professional capacity ... shall mean any employee ...
 
 
 9
 (a) Whose primary duty consists of the performance of:
 
 
 10
 (1) Work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes or ...
 
 
 11
 (e) which includes work requiring the consistent exercise of discretion and judgment ... shall be deemed to meet all of the requirements of this section.
 
 
 12
 Id. § 541.3(a)(1), (e) (1992) (emphasis added).
 
 
 13
 The rules and regulations promulgated by the Secretary of Labor provide guidance in determining what constitutes a "professional capacity." The term "profession" includes those which have a "recognized status and which are based on the acquirement of professional knowledge through prolonged study." Id. § 541.301. The regulations are silent as to how an occupation achieves such status. "Knowledge of an advanced type" is that which cannot be attained at the high school level. Id. § 541.302(b). Listed among those professions which meet the requirement for a "prolonged course of specialized intellectual instruction and study" are "various types of physical ... and biological sciences". Id. § 541.302(e)(1). An appropriate academic degree is prima facie evidence of the possession of professional training. Id. The work must be "predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work." Id. § 541.306(a). This test applies to the type of thinking required of the employee; he or she must not only take in information, which may be a routine procedure, but must also interpret the data. Id. The employee's actual duties and qualifications determine the exemption rather than the mere holding of a professional title. Id. § 541.308(a). "The areas in which professional exemptions may be available are expanding[ ] [a]s knowledge is developed, academic training is broadened, and degrees are offered in new and diverse fields." Id. § 541.302(e)(2).
 
 
 14
 The "primary duty" of an employee is work that constitutes the major part, or more than fifty percent, of his or her time. Id. § 541.103. Time alone however is not the only test; the relative importance of the duties, the frequency with which the employee exercises discretion, and the relative freedom from supervision are all relevant considerations. Id. The employee's primary duty is that which is of principal importance to the employer, rather than collateral tasks which may take up more than fifty percent of his or her time. Dalheim v. KDFW-TV, 918 F.2d 1220, 1227 (5th Cir.1990).
 
 
 15
 The Secretary argues that the state of Wyoming has failed to establish the position of game warden as one with a recognized professional status. He relies on the fact that there is a lack of uniformity among states as to the requirement and duties of game wardens to distinguish them as professionals.[3] However, Wyoming may rightfully require more duties of its game wardens than other states. The complex wildlife and geography of the state makes it logical that they would so do. Moreover, the Secretary's argument puts the cart before the horse. If the particular position satisfies the elements of the short test for the professional exemption, we assume that the position has achieved a professional status. If, on the other hand, it were necessary to have a recognized professional status before the elements of the test could be met, the areas which qualify for the exemption could not be expanding. See 29 C.F.R. § 541.302(e)(3).
 
 
 16
 The Secretary next contends that an advanced specialized degree is not necessary to perform the primary activities of game wardens in Wyoming. He alleges that the wardens are essentially law enforcement officers and information gatherers while the biologists compute and analyze the data. Wyoming, on the other hand, asserts that the primary responsibility of each warden is wildlife management. It argues that the wardens perform a number of collateral tasks such as law enforcement and public relations, but these duties are secondary to their most important responsibility of wildlife management.
 
 
 17
 We find sufficient evidence in the record on appeal to support the district court's finding that the wardens' primary duty is wildlife management. Both parties agree that an employee's primary duty is not only based on the number of hours spent on particular tasks, but is that which is of primary importance to the employer. The fact that a significant amount of the wardens' time is spent on law enforcement, therefore, does not necessarily establish that it is the wardens' primary duty. In Wyoming, the wardens are required to execute a number of complex and scientific tasks such as developing management plans for wildlife, setting population goals, and making recommendations each season for the taking of wildlife.[4] To accomplish these tasks, they must perform some routine procedures such as investigating wildlife damage and taking population surveys, which includes trapping and banding animals. In addition, they serve as liaisons between the state and its citizens by educating the public on wildlife concerns. All of these activities required of the wardens relate to wildlife management.
 
 
 18
 Whether the advanced specialized degree required of the wardens is necessary to the performance of their primary duty is dependent on the demands of the job itself. In order to accomplish the tasks associated with wildlife management, the wardens must have particular knowledge of various species and their habitats as well as the vegetation and general terrain within their districts. A degree in wildlife management or biology or similar field provides the wardens with this requisite knowledge. The degrees cover topics such as wildlife values, habitat, ecology, population management, history of wildlife conservation, ecology of wildlife, and adaptation of animals to environmental constraints with an understanding of animal distribution and survival. The degrees required of Wyoming wardens specifically prepare them for the jobs they are expected to accomplish.
 
 
 19
 Finally, the Secretary argues that the wardens do not consistently exercise the requisite discretion and independent judgment to a degree required of professionals. However, the record establishes that the wardens manage their districts with little supervision other than yearly work schedules and goals. They operate their own offices and serve as the sole representative of the state's game and fish department within the area. The wardens are required to account for their time on a monthly basis in DAR reports but can manage their time each day without supervision. They are responsible for collecting and analyzing data to create yearly population goals; they do so according to their own schedules, accomplishing their tasks throughout the year. Drawing upon their knowledge of wildlife and botany, they make their own estimations as to wildlife damage, population and needs for relocation. We therefore conclude the district court correctly determined that the game wardens exercise professional judgment.
 
 
 20
 Accordingly, we AFFIRM the district court's conclusion that the Wyoming game wardens are exempt from the Fair Labor Standards Act under the professional exemption.
 
 
 
 *
 The Honorable Wesley E. Brown, Senior Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Lynn Martin was Secretary of Labor at the time this action was brought. Robert Reich has been substituted as Secretary pursuant to Fed.R.App.P. 43(c)
 
 
 [2]
 In the original suit, the Secretary also sought overtime pay for state biologists and compensation to the spouses of game wardens for their services in answering telephone calls and accepting visits to their homes which serve as warden offices. The Department excluded the biologists based on a determination that they satisfied the professional exemption. The claim on behalf on the spouses was dropped on appeal
 
 
 [3]
 The Secretary relies on testimony that game wardens in Nebraska are "pretty much law enforcement people ... their sole responsibility is enforcement of Game and Fish regulations," while in Montana their duties are "strictly law enforcement." Aplt.'s app., vol. II, at 269. Yet further testimony revealed that both Idaho and Colorado game wardens are called District Wildlife Managers. As in Wyoming, Idaho and Colorado game wardens have "very similar ... duties to the biologists with the exception that they also do law enforcement." Id. at 270
 
 
 [4]
 The population goals are set by considering a number of factors including the carrying capacity of the habitat for particular species, the health of the current population, population dynamics (i.e. male to female, adult to young ratios, and probable reproduction rates), desires of the sporting public, and tolerance of landowners. The warden makes all the above assessments and recommends the population goals