James R. **BAUDIN**, Plaintiff,

v.

**COURTESY LITHO ARTS, INC.,** Defendant.

No. 97 C 5808.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 10, 1998.

Ernest T. Rossiello, Sandra G. Quello, Ernest T. Rossiello & Associates, Chicago, IL, for Plaintiff.

Jeffrey D. Hupert, Abby Lynn Reagen, Hupert Richards & Wood, Robert H. Brown, Laner, Muchin, Dombrow, Becker, Levin, Tominberg, Ltd., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

James Baudin ("Baudin") has filed suit against Courtesy Litho Arts, Inc. ("Courtesy") under the Fair Labor Standards Act ("Act"), 29 U.S.C. §§ 201–219, the Illinois Minimum Wage Law ("Minimum Wage"), 820 ILCS 105/1 to 105/15 and the Illinois Wage Payment and Collection Act ("Wage Payment"), 820 ILCS 115/1 to 115/15.[1] Baudin seeks damages for Courtesy's failure to pay him for hours of overtime labor he assertedly performed for it and for two days' vacation pay for which he was not reimbursed after termination. Baudin also requests preliminary and permanent injunctive relief under Act §§ 215(a)(3) and 216(b) to restrain Courtesy from retaliating against him or any similarly situated employees for testifying or participating in the suit. Finally, Baudin seeks reasonable attorney's fees and costs as provided by Act § 216(b) and the Minimum Wage and Wage Payment statutes. Courtesy responds with an affirmative defense that Baudin was a salaried employee exempt from the overtime provisions of the Act.

Baudin has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56, to which Courtesy has responded with a cross-motion for summary judgment based on its affirmative defense. Both parties have complied with this District Court's General Rules ("GR") 12(M) and 12(N),[2] which have been adopted to highlight the existence or nonexistence of any material factual disputes. Both parties' motions are fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, Baudin's motion for summary judgment is denied in its entirety, while Courtesy's motion for summary judgment is granted.

*Summary Judgment Standards*

Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.,* 116 F.3d 262, 265 n. 2 (7th Cir.1997)). Where as here cross-motions for summary judgment are involved, it is necessary to adopt a dual perspective that sometimes forces the denial of both motions (see n. 4). That potential for such a dual denial does not arise here, however, because with some possible exceptions the underlying material facts are really not in dispute. And even as to those potential exceptions, the parties have stipulated that should this Court find the existence of any material factual disputes, it may resolve those issues based on the documents submitted with the parties' motions.

*Facts*

Courtesy is a commercial printing company headquartered in Bensenville, Ill. (B.12(M) ¶ 6). It employed Baudin between March 1995 and July 1996. From March

---

**1.** All citations to the Act will take the form "Act § —," using the Title 29 numbering rather than the Act's internal numbering. Pertinent regulations from the 1998 version of 29 C.F.R. are cited "Reg. § —." Each citation to the "Minimum Wage" or "Wage Payment" statutes will follow the quoted designation with " § " and the section number, omitting the "820 ILCS" reference.

**2.** This opinion refers to Baudin's GR 12(M) statement as "B. 12(M) ¶ —" and to Courtesy's GR 12(M) statement as "C. 12(M) ¶ —." Those "B." and "C." abbreviations are also used to refer to the parties' exhibits.

1995 until November 18, 1995 Baudin worked at Courtesy as a film stripper, earning $18.75 per hour (*id.* ¶¶ 4, 8). If he worked more than 40 hours in any week during that time, he received 1–1/2 times his regular hourly rate for the additional hours. Strippers' work involves camera film developing, actual stripping of the work, handling light table work and making plates (*id.* ¶ 5). Film strippers perform that work within Courtesy's pre-press department, which in late 1995 included stripping, proofing and plate-making (C. 12(M) ¶ 13).

In late 1995 Courtesy did not have an employee supervising the pre-press department, as it usually did (*id.* ¶ 14). Plant manager Dennis Porto ("Porto") was attempting to supervise the pre-press department in addition to his other duties, and he was not succeeding in that dual role (*id.*). As a result, the department was not running smoothly or efficiently (*id.*). In November 1995 Baudin met with Courtesy's President David Curcio ("Curcio") to discuss the possibility of Baudin's taking on a supervisory role in the department (*id.* ¶ 16).

After the November 18 meeting Curcio elevated Baudin to a supervisory position in the pre-press department and began paying him a $900 weekly salary (*id.*). When Baudin received that pay increase he took on additional responsibilities within the department (B.12(M) ¶ 10). For example, he implemented changes in how the department was run, distributed work to the other strippers, checked over others' work for errors, answered their questions, attended management meetings and ordered supplies (C. 12(M) ¶ 20(a)—(d)). Baudin also scheduled employees' vacation time, suggested that they go home when work was light and organized lunch breaks so that the department was always covered (*id.* ¶ 20(f)—(i)). Due at least in part to those added responsibilities, Baudin regularly worked significantly more than 40 hours per week after he took over the department (B.12(M) ¶¶ 17, 18).

According to Curcio and others at Courtesy, Baudin was considered a part of the management team (C. 12(M) ¶ 14). Of the people who had previously held any supervisory role in the pre-press department, all but one also had been considered "management" and had been paid on a per-week basis regardless of the number of hours worked (*id.*; Hacker Decl. ¶ 7).

Courtesy terminated Baudin in July 1996 for an error in judgment on a printing project for the Chicago Cubs baseball team. Baudin filed suit on August 18, 1997, seeking (1) compensation under the Act for overtime hours worked between November 18, 1995 and July 15, 1996 and (2) compensation for two days' vacation pay under the Wage Payment statute. Courtesy responded with an affirmative defense alleging that Baudin was employed in an executive capacity from November 18, 1995 to July 15, 1996 and was therefore exempt from the Act's overtime provisions.

### Baudin's Federal Overtime Wage Claim

Act § 207(a)(1) requires Courtesy to pay its employees overtime compensation of 1–1/2 times their normal wages for hours worked in excess of 40 hours per week. Courtesy does not dispute that Baudin often worked more than 40 hours per week after his elevation to supervisor. Rather it claims that Baudin was a "bona fide executive" and hence exempt from the Act's overtime requirements: Act § 213(a)(1) states that "any employee employed in a bona fide executive, administrative, or professional capacity" is not entitled to the protections of those requirements. Courtesy bears the burden of proving that Baudin falls within one of those exemptions (see *Bankston v. Illinois*, 60 F.3d 1249, 1252 (7th Cir.1995)), all of which are to be construed narrowly (*id.*).

Pursuant to Act § 213(a)(1)'s directive to the Secretary of Labor to define and delimit the Act's terms, Department of Labor regulations provide a detailed interpretation of the statutory phrase "employee employed in a bona fide executive...capacity" (Reg. §§ 541.1 to 541.119). Those regulations have "the force and effect of law" (*Haywood v. North Am. Van Lines, Inc.*, 121 F.3d 1066, 1069 (7th Cir.1997)).

Reg. § 541.1 sets forth a multi-factor "long test" for assessing whether a particular employee qualifies as an exempt executive employee. But for employees who are compensated on a salary basis at a rate of $250 or more per week, the regulations provide a "short test" with fewer requirements (Reg. §§ 541.1(f), 541.119). Under that short test

Baudin is considered an exempt executive employee not entitled to overtime pay if (1) he was compensated on a salary basis at a rate of $250 or more per week, (2) his primary duty consisted of the management of the enterprise in which he was employed or of a customarily recognized department or subdivision thereof and (3) his duties included the customary and regular direction of the work of two or more employees. Each of those requirements will be addressed in turn.

### 1. *Compensation on a salary basis*

Courtesy must prove the threshold factor—that Baudin was compensated on a salary basis at $250 or more per week—for the short test to apply. There is no question that Baudin's compensation exceeded the minimum amount of $250 per week, but the parties part company over whether he received that compensation "on a salary basis" as defined by Reg. § 541.118(a):

> An employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

For that purpose Courtesy cannot dock a salaried employee's pay "for absences occasioned by the employer or by the operating requirements of the business" (Reg. § 541.118(a)(1)), but it may make a deduction for sick days "if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by both sickness and disability" (Reg. § 541.118(a)(3)).

Baudin presents two arguments as to why this Court should not consider him to have been paid on a salary basis. Neither succeeds.

■ First, Baudin contends that Courtesy docked his pay during Thanksgiving week in 1995 because he did not work a full 40-hour week. As stated in *Haywood,* 121 F.3d at 1070, "[t]he regulations prohibit monetary discipline of exempt [i.e., salaried] employees." Baudin's pay stubs reveal that for the week ending November 26, 1995, which was not only Thanksgiving week but also the first week in which he was entitled to earn a flat $900, Courtesy paid him just $720 (B.Ex. F, Doc. 00037). That was the only week in which Baudin earned less than $900 [3].

Baudin and Courtesy differ over the reason for that pay deduction. According to Courtesy, Baudin took a day off of work (the Friday after Thanksgiving) without having sufficient time in his paid-vacation bank, so that his pay was legitimately docked (C. Mem.9). According to Baudin the factory was closed on the Friday after Thanksgiving, so he could not have worked that day in any event (B. Ex. B 6).

If Courtesy is correct that Baudin had run out of vacation days, the deduction was perfectly permissible under the Act: Reg. § 541.118(a)(2) states that deductions may be made even if an employee is on salary "when the employee absents himself from work for a day or more for personal reasons, other than sickness or accident." Taking time off beyond the allotted number of vacation days certainly fits that description. If on the other hand Baudin is correct that the plant was closed that day and he could not come to work even if he wanted to, no deduction could be made because the absence would have been caused by the employer (Reg. § 541.118(a)(1)). Although that poses the potential of a material factual dispute,[4] this

---

**3.** Here there is a bit of inconsistency in the documentary record. Courtesy provided a printout of Baudin's paycheck amounts that indicates he received only $720 both for the week of Thanksgiving 1995 and for the week ending January 7, 1996. But Baudin's pay stubs themselves (which this Court deems dispositive) show that his checks were for $900 as to every week except Thanksgiving week 1995 (B.Ex. F, Docs.00037–00072).

**4.** That question would have been quite easy to resolve if documentation relating to Baudin's vacation days or the alleged plant closing had been included in the exhibits provided to this Court, but neither party did so. Such silence in the record, coupled with the Rule 56 need to draw inferences in favor of the nonmovant, would have forced the denial of both motions in most cross-summary-judgment-motion situations (though not here, given the parties' stipulation

Court need not decide the factual matter because even if Baudin's account is accurate he is not taken out of the "on a salary basis" category.

Under *Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) the one-time pay deduction does not of itself mandate a finding that Baudin was not "on salary." In interpreting whether an employee's salary was "subject to reduction" for purposes of the exemption *Auer, id.* at 461–62, 117 S.Ct. 905 held that a "one-time deduction...under unusual circumstances" is permissible even for salaried employees. It upheld the Secretary of Labor's interpretation of the Act that an employee who faced a one-time deduction could still be considered on salary for purposes of the Act's exemptions if the employer had no actual practice of making such deductions and if there was no employment policy that created a "significant likelihood" of such deductions (*id.* at 461, 117 S.Ct. 905).

Baudin fails to point to any other instance of pay docking or to any Courtesy policy that would permit salary deductions to be made based on the quantity or quality of work. Nor does this Court find any such policies in Courtesy's handbook. In fact, Baudin's pay stubs (B.Ex. F, Docs.00037–00072) demonstrate that his salary was *not* reduced for the other day when he claimed the plant was closed (Good Friday 1996), a fact that undercuts any notion of a Courtesy policy of docking salaried employees' pay when the plant was closed.[5] And because Courtesy made the questioned deduction during Baudin's first pay period while on a weekly salary, it is even possible that the deduction was simply a clerical error. Both under normal Rule 56 principles and pursuant to the parties' stipulation for this Court's resolution of disputed facts, this Court finds that the single deduction from Baudin's paycheck in November 1995 does not remove him from the category of employees paid "on a salary basis."

allowing this Court to adjudicate disputed issues).

5. Indeed, the fact that Baudin's salary was not docked for Good Friday supports Courtesy's position that it made the November deduction because Baudin took an excess vacation day, not because the plant was closed.

Baudin's second contention is that he is not exempt from the Act's overtime provisions because Courtesy had a practice of docking Baudin's pay for sick days, something that he asserts was not pursuant to a bona fide policy as the regulations require. But Baudin misunderstands the regulatory provision at issue. Courtesy did not dock his pay when he took sick days, which is what the regulation prohibits in lieu of a bona fide sick leave policy (Reg. § 541.118(a)(3)). Other than the November week discussed above, Courtesy paid Baudin a full $900 every week. Courtesy simply subtracted Baudin's sick days from his allotment of vacation days.

■ Numerous courts have found that employers may make deductions from something other than employees' base pay without destroying those employees' exempt status. As *Hoffmann v. Sbarro, Inc.,* 982 F.Supp. 249, 259 (S.D.N.Y.1997) said after citing several cases to that effect:

> Significantly, most of these decisions relied on past Department of Labor's [sic] opinion letters stating that deductions from an employee's vacation, holiday and sick pay for partial day absences will not render the employee non-exempt under the FLSA, even when such accrued time is subject to a cash pay-out.

Courtesy's deductions from Baudin's vacation time for full-day absences therefore do not render him non-exempt.[6]

Both of Baudin's arguments have thus failed. Courtesy has met the first requirement of the short test by showing that Baudin was "on salary."

2. *Primary duty of management of a customarily recognized department*

■ Prong two of the short test requires that Baudin's "primary duty consist[ ] of the management of...a customarily recognized department or subdivision" of Courtesy (Reg.

6. Furthermore, one of Courtesy's written policies provided a medical leave of absence if an employee had an illness or disability and had already used his or her allotted vacation time (B.Ex. 4, Doc. 200016).

§ 541.119(a)). According to Reg. § 541.104, "[t]he phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of men assigned from time to time to a specific job or series of jobs and a unit with permanent status and function."

Despite its various labels, the pre-press department supervised by Baudin existed as a recognized subdivision at Courtesy. Courtesy's managers and hourly employees had some difficulty in consistently naming and defining the various departments within the company. But the employees' failure to use the same label to describe the pre-press department and its components does not render it nonexistent. Both the department itself and the employees who worked within it had established goals and functions necessary to keep the business operating. Job duties in pre-press did not change, and the department had a separate physical location within the plant. Even Baudin recognized "pre-press" as a department when after his termination he filed an overtime application with the Illinois Department of Labor, stating that he performed supervisory duties in that department (C. 12(M) ¶ 22). Courtesy has established that Baudin supervised a recognized department.

■] To meet the second prong of the short test as well, Courtesy must show that management of that department was Baudin's primary duty. Reg. § 541.103 states that a determination of whether an employee's management duties are primary should be based on all the circumstances. Generally, for an employee to meet that standard more than 50% of his or her time should be spent in management duties (*id.*). But "[t]ime alone...is not the sole test" (*id.;* see also *Vezina v. Jewish Community Ctr. of Metropolitan Detroit*, No. 93–CV–74163, 1994 WL 762214, at *6–*7 (E.D.Mich. Sept. 23), finding that an aquatics director who said she spent more than 80% of her time doing non-management activities was still an exempt executive employee). Even if Baudin spent less than half his time on management matters, his primary duty might still be management based on other factors set out in the regulation: (1) the relative importance of the managerial duties as compared to other duties, (2) the frequency with which the employee exercised discretion, (3) the employee's relative freedom from supervision and (4) the relationship between the employee's salary and the wages paid other employees for the type of nonexempt work performed by the supervisor (here, stripping).

Although the parties dispute precisely how much time Baudin spent on his management duties, this Court finds that it was significant in amount, whether or not it occupied a full 50% of his time. Other Courtesy employees, from plant manager Porto to various strippers working under Baudin, all agreed that Baudin spent a large portion of his time in his supervisory role (Ingo Dep. 13–14; Porto Dep. 12; Merck Decl. ¶ 5). It is true that Baudin spent some time working at his light table at least a few days a week, which suggests that he continued to do some basic film stripping after his promotion. But he also used his light table to check over other employees' work in addition to doing his own stripping work (C. 12(M) ¶ 20(k)). Given Baudin's extensive responsibilities, this Court—in the exercise of its stipulated-to factfinding function—does not credit his unsupported assertion that he spent 85 to 90% of his time on basic stripping (Baudin Dep. 91–92).

Weighing the factors other than time allocation listed in Reg. § 541.103 further persuades this Court that Baudin's primary duty was management. As to the first factor, the relative importance of managerial duties, *Reich v. Wyoming,* 993 F.2d 739, 742 (10th Cir.1993) has put it in these terms:

> The employee's primary duty is that which is of principal importance to the employer, rather than collateral tasks [that] may take up more than fifty percent of his or her time.

Baudin's management duties included distributing work to the other strippers, scheduling vacation and break times, ordering supplies and checking over other employees' work for mistakes (C. 12(M) ¶ 20). Those duties were undisputably more important to the company's success than Baudin's pure production stripping. It must be remembered that Baudin took on his supervisory role in the first place because the pre-press department was inefficient and unorganized

(C. 12(M) ¶ 14)—Courtesy needed someone to fill that position to continue to operate effectively.

Baudin also exercised discretion, which is the second factor listed in the regulation. If looked at in a vacuum, Baudin's basic distribution of the work would not likely involve sufficient discretion because "[d]iscretion in this context...must be more than that which normally characterizes direction of work of others. It too must be critical to the success of the enterprise" (*Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1146 (3d Cir. 1983)). But Baudin's duties surely met that last test, for they extended beyond merely directing the work of others. His tasks were not "so completely routinized that he ha[d] no discretion" (Reg. § 541.107(a)). Baudin had full responsibility for mistakes made by his subordinates, he took part in management decisions such as allotting vacation time and he handled other tasks like taking inventory and ordering supplies. He also developed a new set of forms for employees to use to ensure the accuracy of their work (C. 12(M) ¶ 19). All those tasks necessarily involved the exercise of discretion.

Baudin vehemently disputes that he meets the third factor, relative freedom from supervision. He asserts that plant manager Porto contradicted his instructions to employees and essentially made it impossible for him to distribute work (B.12(M) ¶ 15). Although Courtesy concedes that Porto did at times contradict Baudin's directions (C. Mem.14), Baudin's subordinates indicated that they often followed Baudin's instructions (Merck Decl. ¶¶ 4, 5; Ingo Decl. ¶ 10). Close supervision and established guidelines do not necessarily eliminate an employee's freedom and discretion, as Baudin argues (see *Donovan v. Burger King Corp.*, 675 F.2d 516, 521–22 (2d Cir.1982); *Vezina*, 1994 WL 762214, at *8). Baudin had sufficient control of and responsibility for the pre-press department to show relative freedom from supervision, particularly when compared to his subordinates, who had no control over how their time at work was spent.

One final criterion is listed in the regulation: the difference between Baudin's wages and those of the employees he supervised. After being placed on a flat rate of pay, Baudin received $900 per week, more than any paycheck he received while Courtesy paid him at an hourly rate. And the weekly compensation of the hourly employees he supervised generally fell significantly below Baudin's level, even with overtime pay. Film stripper Paul Merck, for example, never made more than $625 per week (Hacker Decl. [7][7]). Bob Ingo twice made more than $900 per week including overtime compensation (*id.* [10]; C. 12(M) ¶ 24), but Baudin still earned significantly more than Ingo most of the time. Furthermore, Baudin received some benefits other employees did not. For example, non-managerial Courtesy employees were required to account for eight hours of their day by logging onto the company's computer system, while Baudin was not (C. 12(M) ¶ 28).

Considering both the significant amount of time Baudin spent on management duties and the other factors listed in the relevant regulations, this Court finds that Baudin's primary duty was management of the pre-press department. That satisfies the second element of the three-part short test.

### 3. Customary and regular supervision of two or more employees

To establish the final element of the short test, Courtesy must prove that Baudin's duties included the customary and regular supervision of two or more full-time employees (Reg. § 541.119). Baudin clearly supervised the six or seven employees who worked in the pre-press department on the day and night shifts (C. 12(M) ¶ 13). In fact, night-shift workers even called Baudin at home if they had questions or concerns about their work (Ingo Decl. ¶ 11, 12). Courtesy has no problem in demonstrating that Baudin fit the third requirement of the short test.

As a matter of law, then, Baudin comes well within the exemption from overtime compensation set forth in the Act and interpreted by the regulations. It is plainly appropriate to grant summary judgment to

7. Because Courtesy did not number the documents attached to the declaration of office manager Constance Hacker, the page number is placed in brackets.

Courtesy and deny summary judgment to Baudin on the federal overtime claim.

### Baudin's State Overtime Wage Claim

Baudin does not deny that the success of his state law claim under the Minimum Wage statute is intertwined with the success of his federal claim under the Act. Minimum Wage § 105/4a(1) parallels the language of Act § 207(a)(1), and Illinois courts subject the state statute to the same interpretation and application as its federal counterpart (*Haynes v. Tru–Green Corp.*, 154 Ill.App.3d 967, 977, 107 Ill.Dec. 792, 507 N.E.2d 945, 951 (4th Dist.1987)).

This Court therefore treats the two statutes as co-extensive, as did *Condo v. Sysco Corp.*, 1 F.3d 599, 601 n. 3 (7th Cir.1993). Accordingly, Courtesy's Rule 56 motion as to Baudin's claim under the Minimum Wage statute is granted and Baudin's is denied for the same reasons as stated in the preceding sections.

### Baudin's State Vacation Pay Claim

Under Wage Payment § 115/5, when Courtesy terminated Baudin it had to pay him "the monetary equivalent of all earned vacation." Here the parties' dispute is a purely factual one: How many vacation days had Baudin used when he left Courtesy? Although the parties have presented very little evidence relevant to that question, their arguments reduce to a disagreement about Courtesy's policy on sick leave for managerial employees.

Baudin claims that when he was terminated in July 1996 he was not paid for two days of vacation to which he was entitled, in violation of Wage Payment § 115/5. Courtesy responds that two days of sick leave were properly deducted from his vacation days pursuant to Courtesy's policy that days taken off for illness were considered vacation days (C. 12(M) ¶ 25). Baudin states that he had no knowledge of Courtesy's policy on sick leave for salaried employees because he was never informed of any such policy (B. Answer to C. 12(M) ¶ 25). Indeed, Courtesy's employee handbook does not discuss its policy on sick leave, although it does cover holidays, vacation time, personal leaves of absence, medical leaves of absence and other issues (B.Ex. 4).

Baudin bears the burden of proof on the Wage Payment claim (*Bjornson v. Daido Metal U.S.A., Inc.*, 12 F.Supp.2d 837, 838 n. 2 (N.D.Ill.1998)). Yet the only evidence he has presented in support of his claim is his lack of knowledge as to Courtesy's sick leave policy—nothing really challenges Courtesy's version of that policy. Baudin's submission does not suffice to sustain his burden. Accordingly, Courtesy's motion for summary judgment as to the Wage Payment claim is granted and Baudin's is denied.

### Conclusion

Although the existence of disputed issues of material fact would likely have precluded summary judgment in this case, the parties stipulated that this Court is entitled to resolve any such disputes as needed to decide the cross-motions for summary judgment. Based on the findings and reasoning set forth above, this Court finds and holds that Courtesy prevails as a matter of law on all three of Baudin's claims. This action is dismissed with prejudice.