**F I L E D**

**UNITED STATES COURT OF APPEALS**

**February 13, 2007**

**TENTH CIRCUIT**

SHERRY HAMBY,

      Plaintiff - Appellant,

v.

ASSOCIATED CENTERS FOR
THERAPY, a/k/a Tulsa Systems of Care;
LARRY MARKS, in his official and
individual capacities; CARL HAWES, in
his official and individual capacities;
BRIAN BLANKENSHIP, in his official
and individual capacities,

      Defendants - Appellees.

No. 06-5043
(D.C. No. 04-CV-631-TCK-FHM)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, **BRISCOE**, Circuit Judges and **ROBINSON**, District Judge.[**]

Plaintiff-Appellant Sherry Hamby was employed by Associated Centers for

Therapy ("ACT"), an agency that provides services for children and families with

---

[*]This order and judgment is not binding precedent, except under the doctrine of law of the case, res judicata, and collateral estoppel. The Court generally disfavors the citation of orders and judgements; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]Honorable Julie A. Robinson, U.S. District Judge, District of Kansas, sitting by designation.

mental health problems. ACT terminated Hamby from her position as a "family advocate" in April 2004. Hamby then filed an action against ACT, Larry Marks, Bryan Blankenship, and Carl Haws:[1] alleging retaliation under Title VII of the Civil Rights Act of 1964; violations of the Fair Labor Standards Act ("FLSA") by failing to pay overtime and for termination in retaliation for reporting such wage violations; violation of 42 U.S.C. § 1985; and Oklahoma state law claims for public policy tort and intentional infliction of emotional distress.[2] The district court granted summary judgment in favor of defendants on all of these claims. Exercising the appropriate standard of review,[3] we affirm.

I.     **Background**[4]

ACT is an Oklahoma non-profit corporation that offers outpatient therapy, rehabilitation, and case management services to the seriously mentally ill. The Systems of Care ("SOC") Best Practice Model is a defined federal and state policy for addressing

---

[1]Hamby also named the Oklahoma Department of Mental Health, but later voluntarily dismissed this party from the action.

[2]Hamby also brought claims for sexual and racial discrimination and an Oklahoma state wage law claim. The district court granted summary judgment in favor of defendants on the discrimination claims, and Hamby conceded her state wage law claim. These claims are not presented to this Court on appeal.

[3]"We review a district court's decision granting summary judgment *de novo*, resolving all factual disputes and drawing all reasonable inferences in favor of the non-moving party." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[4]We review the following facts in the light most favorable to Hamby, drawing reasonable inferences therefrom. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1167 n.2 (10th Cir. 2006).

the needs of mentally ill children and their families. In January 2001, Tulsa Systems of Care ("TSOC") was created as a program offering services for children and families with mental health problems. ACT is the host agency of TSOC, and it receives funding and is under contract with the Oklahoma Department of Mental Health ("ODMH") to administer the TSOC program.

ACT employs several persons in various positions to administer the TSOC program, including a position called "family advocate." To qualify for a position as a family advocate, a person must have raised or lived with a child with emotional problems. The family advocate provides targeted support services, implements a system of care that is child-centered with the needs of the child and the family directing the appropriate services, and assists in preventing an out-of-home placement.

In 1999, Carl Haws asked Hamby, a parent of a child with a serious emotional disturbance, to volunteer and assist in the creation of TSOC. In her volunteer efforts, Hamby served on both the state and local steering committees for SOC. In January 2001, Hamby became a volunteer family advocate. In July 2001, Hamby began working as a part-time, salaried advocate with ACT. In 2003, Hamby was hired in a full-time position as a family advocate. At all relevant times, Haws was Hamby's supervisor.

Haws evaluated Hamby's job performance in January 2002 and on July 23, 2003. Hamby received a good rating of 8.15 on a scale of 1 to 10 on both of these evaluations. However, Haws noted some concerns with Hamby's employment in the objectives

section of both evaluations. In the January 2002 evaluation, Haws noted that Hamby needed to improve her communication skills by omitting foul language and colorful examples. Haws wrote that Hamby needed to "back off" and "let others do their work." In the July 2003 evaluation, Haws wrote that Hamby needed to avoid inter-office conflicts "by understanding that everyone is different." Hamby contends that the comments in the objectives section were not made by Haws, but rather that she identified these areas as needing improvement.

During her employment with ACT, Hamby received four reprimands. She was first reprimanded on October 17, 2002, when she received a documented verbal review from Haws for being disrespectful to him and other staff members during a meeting. Hamby alleges that she received this reprimand after questioning whether Haws bought computers for employees using "flex funds," which were primarily reserved for client families. The ODMH investigated Hamby's allegation and found no wrongdoing by Haws. Hamby received two more documented verbal reviews on September 19, 2003. Hamby was reprimanded for allegedly neglecting her duties when she asked her daughter to inform her employer that she would not be attending a meeting with TSOC clients on September 11, 2003. Hamby's daughter telephoned ACT thirty minutes prior to the meeting, and she apparently spoke to someone other than Haws. Hamby was further reprimanded on October 6, 2003, for failing to give support to a client-family and for being rude. On October 8, 2003, Hamby was disciplined for disregarding the management system by complaining about her supervisors and coworkers.

-4-

Hamby alleges that over the course of her employment with ACT, she suffered many abusive and retaliatory acts by Haws and her coworkers. Hamby asserts that in February 2002, Haws verbally accosted her after a TSOC Steering Committee meeting. During that meeting, it was discussed whether two volunteer advocates should be changed to paid status, and Hamby alleges that Haws opposed the change. Hamby contends that after the meeting Haws told her never to challenge him in public again, and after that incident, Haws became routinely verbally abusive and retaliatory toward her. Hamby also alleges that during a staff meeting on August 8, 2003, Haws announced that TSOC had incurred a budget deficit. Hamby requested documents reflecting the budget from Haws and tried to reconcile the deficit. Hamby discovered what she believed to be discrepancies in the budget and expressed her concerns to Haws. Hamby alleges that Haws screamed at her that she was wasting her time. Afterwards, Hamby inquired about the need for an audit of TSOC expenditures to various directors of the TSOC program.

On August 11, 2003, Hamby emailed Janice Hendrix, chairperson for the state SOC Steering Committee, and complained that Haws and others made derogatory comments about her at the most recent meeting of the Committee. Hamby alleges that on August 14, 2003, in response to her email to Hendrix, Haws threatened Hamby and called her a liar. She further alleges that a coworker had to prevent Haws from further accosting her. On August 20, 2003, Hamby filed a complaint with the TSOC Steering Committee against Haws regarding the August 8, 2003 incident, the August 14, 2003

incident, the amount of her annual raise, and Haws' refusal to provide her with a letter of recommendation. Hamby also filed a complaint with the Oklahoma Human Rights Commission ("OHRC"), which was later transferred to the Equal Employment Opportunity Commission, alleging hostile work environment and retaliation based on the August 14, 2003 incident.

On August 22, 2003, Ruth Archer, a coworker of Hamby's, filed a grievance against Hamby in which she complained about Hamby's job performance and the hostile environment that she was creating at TSOC. Archer stated that Hamby would "lash out" and send emails about TSOC and Haws any time that she got upset. Archer expressed concern that Hamby's communications were not in the best interest of TSOC and its clients. Archer later withdrew this grievance.

On September 2, 2003, Haws and Bryan Blankenship, Clinical Director of ACT, met with Hamby. Haws advised Hamby that she would need his prior approval of all email communications about TSOC before dissemination. Hamby was also told not to complain to others about her supervisor, but rather she should "vent" to certain, authorized persons.

On September 5, 2003, Haws received a letter from a TSOC client, Michelle Motisi, requesting that Hamby be removed from her child's case due to personality differences. Motisi stated that Hamby had treated her hatefully during a telephone conversation.

At a regularly scheduled staff meeting on September 11, 2003, Hamby alleges

-6-

that she was confronted by her coworkers with rumors that she was sending out derogatory emails about TSOC. The coworkers expressed concern that such emails were threatening the reputation of TSOC and creating a hostile work environment. After the meeting, Hamby alleges that she suffered extreme anxiety, dizziness, nausea, and vomiting. Soon afterwards, Hamby filed a complaint with the Occupational Safety and Hazard Administration ("OSHA") contending that she felt threatened by her coworkers at the September 11, 2003 meeting.[5] This incident preceded the reprimands that Hamby received on September 19, 2003.

Hamby alleges that on September 24, 2003, an emergency staff meeting was held to discuss her OHRC and OSHA complaints. However, defendants contend that this was a normal, routine "teambuilding" meeting lunch held at a Pizza Hut. Hamby alleges that she again felt threatened by her coworkers at this meeting, but there is no testimony by any witness who recalls any threats or hostility directed at Hamby.

On September 29, 2003, another TSOC client, Susan Bloxsom, requested that Hamby be replaced as the family advocate assigned to her child's case. Ms. Bloxsom complained about Hamby's rudeness and unavailability.

Hamby alleges that in November 2003, Haws allowed Archer to draft and present an agreement for Hamby's signature. The agreement purported to prohibit Hamby from tape recording meetings and would impose criminal penalties if she violated the

_____

[5]This staff meeting was a separate meeting from the TSOC client meeting that occurred on the same day and for which Hamby was reprimanded when she failed to attend.

agreement. There is a dispute as to whether the agreement was presented to Hamby. Hamby alleges that the presentation was intended to intimidate or harass her. Haws denies that he authorized Archer to present the agreement.

On November 26, 2003, Haws and Blankenship met with Hamby to discuss alleged statements that she made while attending a meeting in Washington, D.C. Hamby denied speaking about the internal business of TSOC, but Haws again reminded her not to discuss TSOC matters or her conflicts with Haws outside of TSOC. Hamby alleges that the ODMH contacted Blankenship to state its concerns about her comments to federal policymakers. On January 26, 2004, ACT received an email from TSOC Steering Committee member Regina Rogers-Boyce in which she expressed concern that Hamby was making repeated complaints to others about Haws and TSOC. Rogers-Boyce stated that she felt such comments were not good "for team morale or anything else."

Haws and Blankenship again held another meeting with Hamby on February 23, 2004, to discuss improper communications that she made. Hamby had allegedly communicated with persons outside of TSOC regarding events at the TSOC Steering Committee meeting. At the February 23, 2004 meeting, Haws distributed a memorandum to all staff. The memorandum, dated February 23, 2004, states that all communications about TSOC business need to be sent to and approved by Haws before distribution to the intended recipient. Hamby contends that she was told on March 10, 2004, that the policy applied only to written communications, but there is evidence that

other employees of ACT were aware that the policy applied to all external communications.

On April 12, 2004, Blankenship received information that Hamby had contacted Carol Schneider, an employee at the ODMH, regarding whether the child of a TSOC employee could be eligible for the TSOC program. Blankenship learned that Hamby had given Schneider specific information about the employee's child. Hamby contends that she only asked general policy questions about the availability of the program to children of TSOC employees, but Schneider testified that Hamby revealed specific information about the potential client. Defendants contend that Hamby did not receive prior approval for this communication and that she conveyed privileged information about a potential client. Hamby contends that she received permission to call Schneider from Assistant Project Director, Marcia Keesee. But Keesee testified that she did not give Hamby approval to call the ODMH regarding the question of whether the child of an TSOC employee is eligible for the program.

On the same day that Schneider received the call from Hamby, Schneider sent an email to her supervisors at the ODMH regarding the conversation. The relevant portion of Schneider's email states:

> Just to give you a heads up.
>
> Sherry Hamby called me on the way to work this morning. She was very angry that Ruth Archer's son was being reviewed by the Care Team. She said it wasn't right. She said the rules were changed and no one told her. She said that she had to tell Grace that she could not be a Family Advocate until her child graduated. She said that TSOC has

5 or 6 cases still waiting and won't be reviewed until next month. She said that it was unfair that a Family Advocate gets preferential treatment. She said the rule change had not been discussed before the Community Team.

Hamby was terminated on April 15, 2004 for "failure to meet job expectations." The termination letter reads: "[y]our failure to clear all external communications with your supervisor, Carl Haws, prior to the transmission is the offense on which this action is being taken." Hamby appealed her termination, which ACT denied. The letter denying Hamby's appeal discussed the numerous incidents in which Hamby failed to clear external communications with Haws. Further, ACT concluded in this letter that based on all of the complaints, incidents, and reprimands surrounding the communication policy, Hamby was fully aware of this policy and she was in violation of it when she telephoned Schneider in April 2004.

Hamby then brought this action. The district court granted summary judgment in favor of defendants on Hamby's claims of retaliation under Title VII, violations of the FLSA by failing to pay overtime and for termination in retaliation for reporting such wage violations, violation of 42 U.S.C. § 1985, and Oklahoma state law claims for public policy tort and intentional infliction of emotional distress. Each claim is discussed in turn.

## II. Discussion

### A. Title VII Claims

#### 1. Retaliation

The district court granted summary judgment on Hamby's Title VII retaliation

claim finding that she had failed to show that defendants' proffered reasons for her termination were pretextual. When analyzing Title VII retaliation claims, this Court applies the *McDonnell Douglas* burden shifting approach. *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). Under that approach, a plaintiff's establishment of a *prima facie* case creates a presumption of retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). The burden then shifts to the defendant to produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Id.*, 93 S. Ct. at 1824. If the defendant meets this burden, the burden then shifts back to the plaintiff to present evidence that the proffered reason was pretext. *Id.* at 804, 93 S. Ct. at 1825.

"To establish a *prima facie* case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo*, 452 F.3d at 1202 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405, 2414–15, 165 L. Ed. 2d 345 (2006); *Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1119 (10th Cir. 2005)). Hamby has established a *prima facie* case of retaliation. First, Hamby engaged in protected activity by filing an OHRC complaint in August 2003 and an OSHA complaint in September 2003. Second, Hamby began receiving an increased number of reprimands, a challenged action which a

reasonable employee would find materially adverse. Finally, the close temporal proximity between the complaints and the reprimands is sufficient to allow an inference that there was a causal connection between the protected activity and the challenged action. *Id.* (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

The burden then shifts to defendants to show a legitimate, nondiscriminatory reason for the employment action. In this case, Hamby was terminated from her employment when her supervisors learned that she had disclosed a potential client's confidential information after being repeatedly instructed to clear all external communications regarding TSOC business through her supervisor, Haws. This is a legitimate reason to terminate Hamby. Therefore, the burden shifts back to Hamby to show that the proffered reason for her termination was pretext for retaliation. *Id.*

To show pretext, Hamby must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id*. (citing *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997)). Hamby argues that she brought forth evidence to place the following material facts in dispute: (1) whether defendants had an established policy that required all forms of communication regarding TSOC business to be cleared with Haws before dissemination; and, if so, (2) whether Hamby violated that policy.

-12-

Hamby contends that defendants' communication policy applies only to emails. Two of her coworkers testified that they were aware of the communication policy, and stated that the policy applies to email communications. However, in a February 23, 2004 memorandum, Haws informed all TSOC staff that *all* communications about TSOC business must be sent through Haws before dissemination. Hamby asserts that she never received this memorandum while she was employed at ACT, but Ruth Archer testified that she remembered receiving a memorandum describing the policy. Even though two employees testified that they believed the policy applied to email communications, Hamby cannot controvert the fact that defendants' communication policy, as written in the February 23, 2004 memorandum, was that all communications were to be approved by Haws before dissemination.[6]

Even if Hamby did not violate this policy because, as she contends, the policy applies only to written communications or that she had permission to make the telephone call, the Court must "look at the facts as they appear to the person making the decision to terminate the plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). In this case, the people making the decision to terminate Hamby were Blankenship, Marks and Haws.[7] At the time of her termination, the

_____

[6]Hamby suggested to the district court that this memorandum was fabricated to support her termination, but she offers no evidence, other than speculation, to support this allegation. Conclusory allegations, lacking evidentiary support in the record, are insufficient to show pretext. *Salguero v. City of Clovis*, 366 F.3d 1168, 1178 (10th Cir. 2004).

[7]At oral argument, defendants stated that the final decisionmakers were Blankenship and Marks, while Hamby stated that the decision to terminate her

-13-

decisionmakers had information that Hamby had placed the telephone call, unauthorized under the communication policy, and that she had divulged confidential information regarding a potential client. After Schneider received Hamby's telephone call, she sent an email to her supervisors at the ODMH describing their conversation, including that Hamby had revealed confidential information about a potential client. One of Schneider's supervisors contacted Blankenship and informed him that Hamby had given Schneider specific information about the employee's child. Blankenship also learned that Hamby did not have permission to make this telephone call.[8] The uncontroverted evidence shows that the decisionmakers knew at the time of her termination that Hamby had divulged confidential information[9] about a potential client, without permission to do

---

employment was made by Haws. The record shows that all three participated in the termination decision. First, defendants conceded to the district court that all three people made the decision to terminate Hamby. Aplt. App. at 23. Further, in a letter from Marks to Hamby informing her of her termination, Marks stated that he reviewed the material prepared by Blankenship and Haws recommending Hamby's termination. Aplt. App. at 144. The letter states that the reason for Hamby's termination is her failure to clear communications with Haws, prior to the transmission. *Id.*

[8]Hamby contends that she received permission from Keesee to telephone Schneider, but Keesee testified that she did not give Hamby approval. Even if Hamby received approval from Keesee, as Hamby contends, Keesee authorized her to call to see if the SOC policy had been changed. Aplt. App. at 225. Based on her own assertion, Hamby only had permission to ask general policy questions, and Keesee clearly did not authorize Hamby's communication of confidential information.

[9]Hamby argues that Schneider, as a member of the SOC staff, had full access to all confidential information of ACT and of SOC clients, and therefore Hamby did not disclose confidential information when she discussed specific information about this employee's child. But defendants argue that Schneider, as an employee of the ODMH, did not have access to confidential information regarding *potential* clients. As stated above, the Court must look at the facts as they appear to the decisionmaker. *Kendrick*, 220 F.3d at 1231. At the time of her termination, the decisionmakers had received

-14-

so, thereby providing the reason for her termination.

To the extent Hamby contends that Blankenship and Marks relied on pretextual reasons, provided by Haws, and gave perfunctory approval to terminate Hamby based on Haws' recommendation, the Court rejects such claims. Under the "rubber stamp" doctrine, a plaintiff can bring a Title VII claim when "a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288 (4th Cir. 2004)). This Court has held that for a plaintiff to prevail on such a claim, she must show that a biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action. *Id.* at 487.

Although Haws was involved in the termination decision, Blankenship, as the Clinical Director of ACT, was also actively involved in Hamby's termination, and not merely a "rubber stamp." In this case, Blankenship independently investigated the allegations of Hamby's improper communications. *See id.* at 488 ("[A]n employer can avoid liability by conducting an independent investigation of the allegations against an employee."). In fact, Blankenship was closely involved in disciplining plaintiff's improper communications in the months preceding her termination. Blankenship

information that Hamby had disclosed confidential information to Schneider and terminated Hamby for initiating this communication.

-15-

participated in meetings with Hamby on several occasions[10] in which he and others addressed Hamby's improper, external communications. Blankenship stated that at the February 23, 2004 meeting, he informed Hamby, and she expressed an understanding, that "communication" included verbal as well as written. Aplt. App. at 128. A memorandum was issued that same day to all staff informing them of the communication policy.[11] Blankenship learned on April 12, 2004 that Hamby had made an unauthorized telephone call, and he stated in Hamby's appeal of her termination, "[o]n the basis of this contact, and that you had been repeatedly counseled previously regarding outside contact having to do with TSOC business, management deemed this serious conduct to warrant immediate termination." Aplt. App. at 128. Therefore, the record shows that Blankenship's decision to terminate Hamby was based on her improper, external communication and was not based on any of the alleged pretextual reasons attributed to Haws.

Also, the record shows that Marks, as Executive Director of ACT, made his decision to terminate Hamby after reviewing Blankenship and Haws' recommendations and determining that Hamby violated the communication policy. While Marks

---

[10]The record shows that Blankenship attended meetings with Hamby on September 2, 2003, November 26, 2003, and February 23, 2004.

[11]Hamby contends that Haws told her that the communication policy applies only to *email* communications, and therefore, her *telephone* conversation did not violate the policy and was not a valid basis for her termination. Aplt. App. at 224. Even accepting Hamby's allegation as true, Haws' alleged statement of the policy would not negate the views of Blankenship and Marks who determined that Hamby's telephone call was unauthorized under the communication policy.

considered Haws' recommendation, Marks also relied on Blankenship's valid reason for recommending Hamby's termination—her improper external communication—and Marks determined that her communication did, in fact, violate the communication policy. Hamby has not shown that Haws' allegedly discriminatory recommendation caused her termination when Marks also relied on Blankenship's valid reason for firing Hamby. Thus, Marks based his decision on a valid reason for Hamby's termination, and there is no evidence of pretext.

Hamby also contends that pretext is established by the timing between her complaints and the adverse employment actions taken against her. "Close temporal proximity between the employee's complaint and the adverse employment action is a factor in determining whether the employer's proffered reason is a pretext for retaliation." *Pastran v. K-Mark Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000). But mere conjecture that defendants acted with discriminatory reasons is not sufficient to establish pretext. *Annett v. University of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). Hamby argues that the evidence shows that after she made her complaints, she suffered retaliation in that she began receiving an increased number of reprimands. But, as the district court noted, all of the reprimands that Hamby received are tied to an improper action by Hamby, and there is no evidence that the reprimands resulted from hostility based on her complaints.

Further, Hamby asserts that there is additional evidence of pretext including her

allegations that Haws verbally assaulted her on several occasions, her contention that the ODMH was concerned about her comments to federal policymakers and that she would contact legislators in the future, and the fact that Hamby had received positive reviews before she filed her complaints. However, none of these allegations demonstrate any weaknesses or implausibilities in defendants' legitimate reason for terminating her employment after learning that Hamby had made an unauthorized communication and divulged confidential information, and a reasonable factfinder could not rationally find this reason unworthy of credence. We agree with the district court that these allegations are not evidence of pretext to rebut defendants' legitimate reason for terminating Hamby. Because Hamby has failed to raise a genuine issue of material fact as to whether defendants' proffered reason for her termination is pretext for retaliation, we affirm the district court's decision to grant summary judgment in favor of defendants as to this claim.

### 2. *Coworker Retaliation*

For an employer to be held liable for coworker retaliation, a plaintiff must show that supervisors or management personnel either (1) orchestrated the harassment or (2) knew about the harassment and acquiesced in it in such a manner as to condone and encourage the coworkers' actions. *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998). Because Title VII is neither a general civility code nor does it provide relief for the ordinary tribulations in the workplace, incidents of rudeness by coworkers are insufficient to support a claim for retaliation. *Id.* (citing *Faragher v. City*

*of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2286–84, 141 L. Ed. 2d 662 (1998)).

Hamby relies on two incidents as evidence to support her claim for coworker retaliation. First, Hamby contends that an emergency staff meeting was held on September 24, 2003, and that this meeting was called specifically to address her complaints to OSHA and the OHRC. Hamby filed her OSHA complaint after a meeting on September 11, 2003, in which her coworkers discussed her communication of internal information about TSOC to outside sources and her conflict with Haws. Hamby contends that Haws called the September 24 meeting to address Hamby's OSHA complaint, and she argues that Haws' attendance and participation in the meeting is circumstantial evidence that he orchestrated and condoned the harassment that allegedly took place at the meeting. However, Hamby offers no evidence to refute that this was a regularly scheduled "team building" meeting held at a Pizza Hut, attended by ACT and TSOC employees to build positive, working relationships. Hamby points to an unofficial transcript that purports to document the discussions at the September 24 meeting. But the district court noted that throughout the transcript, it appears that Hamby's coworkers were unaware that she had made the complaints. Further, there is no evidence in this transcript that Haws orchestrated or condoned any alleged harassment at the September 24 meeting.

As to the second incident, Hamby alleges that Haws condoned the drafting and presentation of an agreement to Hamby for her signature that would prevent her from

tape recording meetings. There is evidence that Hamby was tape recording meetings at ACT, and that this was creating an internal conflict among the staff. It is unclear as to whether Hamby was actually presented with this agreement. Hamby argues that it can be inferred from Ruth Archer's testimony that the agreement was presented to Hamby and that it is uncontroverted that Hamby received the agreement. Assuming that Hamby was presented with the agreement for her signature, she cannot provide evidence to show that the presentation of the agreement was retaliation against her. Rather, the record shows that Hamby's taping of meetings was creating an internal conflict that defendants sought to resolve. While Hamby alleges that she suffered harassment when she was presented this agreement, her allegations are insufficient to bring a claim for coworker retaliation, for such an ordinary tribulation in the workplace.

In addition to these two incidents, Hamby argues that the totality of the circumstances show that her supervisors orchestrated harassment. Hamby contends that all of the events described above, when taken as a whole, support her claim for coworker retaliation. However, even when viewing all of these incidents together, Hamby has failed to put forth any specific facts or evidence from which a jury could infer that supervisors or management orchestrated, condoned or encouraged coworker retaliation. Accordingly, because there is insufficient evidence in the record to support a claim against defendants based on coworker retaliation, summary judgment on this claim is affirmed.

**B.         FLSA Overtime Claim**

The district court granted summary judgment on Hamby's FLSA overtime wage claim finding that she qualifies for the administrative exemption from the FLSA.[12] Under 29 U.S.C. § 207, an employer is required to pay an employee overtime wages unless the employee fits into an exemption under 29 U.S.C. § 213.  "Exemptions to the FLSA are to be narrowly construed; the employer must show the employees fit 'plainly and unmistakenly within [the exemption's] terms.'"  *Reich v. Wyoming*, 993 F.3d 739, 741 (10th Cir. 1993) (quotations omitted).  Whether Hamby's employment activities plainly and unmistakenly fit into the exemption and exclude her from FLSA coverage is question of law that we review *de novo*.  *Id.* (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S. Ct. 1527, 1530, 89 L. Ed. 2d 739 (1986)).

The district court relied on 29 C.F.R. § 541.214 (2002), which provides that employees who are compensated on a salary basis rate of at least $250.00 per week are exempt from the overtime requirements provided that "the employee's primary duty consists of either the performance of office or nonmanual work directly related to management policies or general business operations of the employer . . . where the performance of such primary duty includes work requiring the exercise of discretion and

---

[12]The district court assumed, without deciding, that the FLSA applied to ACT. Defendants argue that the FLSA does not apply to ACT because the Department of Labor concluded the same.  Like the district court, we will assume that the FLSA applies to ACT when analyzing Hamby's FLSA claims.

independent judgment."[13]  It is undisputed that Hamby meets the salary requirement, and therefore we must determine whether Hamby's primary duties consisted of office or nonmanual work directly related to management policies or general business operations in which she exercised discretion and independent judgment in her position.

Hamby argues that her job description fails to meet the requirement that her "primary duty consists of either the performance of the office or nonmanual work directly related to management policies or general business operation of the employer." "The phrase 'directly related to the management or general business operations . . .' describes those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work." 29 C.F.R. § 541.205(a) (2002).  The Fifth Circuit has described the distinction between these two types of work as: "between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990).  Hamby contends that she produced a commodity for ACT by carrying out the day-to-day operations of ACT.

Hamby describes her duties as a family advocate as follows: "(1) [s]upport for the child and his/her family; (2) [b]e active member of the local teams; (3) [b]e a member of the family team to assist in the strengths and the assessment and care plan

---

[13]The 2002 verison of this C.F.R. regulation was in effect at all times pertinent to this case.  This regulation has been amended and codified at 29 C.F.R. § 541.200.

development; (4) [t]o mediate between the families and the professionals; (5) [a]t times provide transportation; (6) [t]o fill out and submit 'flex forms' for the families as needed; (7) [t]o attend or speak at conferences as needed and assigned by the Project Director; and, (8) [o]ther duties as assigned by the Project Director." All of these duties are the type of work that is directly related to assisting with the running or servicing of ACT. Hamby's job required her to assist client families by advising and counseling them regarding their problems and by advocating for them in order to promote ACT's goal of helping families of mentally ill children. In providing support to these families, Hamby's job duties cannot be likened to the type of work performed on a manufacturing production line or in selling a product in a retail or service establishment. Hamby's work in providing services to the client families was not akin to production or sale of a commodity; rather, her work was directly related to the general business operations of ACT.

Further, Hamby contends that she did not exercise the requisite discretion and independent judgment in her employment position. "[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a) (2002).[14] The exercise of discretion and independent judgment "implies that the person has the authority or power to make an

---

[14]The district court cited the current version of this regulation, codified at 29 C.F.R. § 541.202(a). While the two versions are substantively parallel, the Court will apply the 2002 version of this regulation because it was in effect during Hamby's employment with ACT.

independent choice, free from immediate direction or supervision and with respect to matters of significance." *Id.* However, employees can exercise discretion and independent judgment "despite the fact that their decisions or recommendations are reviewed at a higher level." *Id*. at § 207(e)(2). The exercise of discretion and independent judgment requires more than "work along standardized lines involving well-established techniques and procedures which may have been cataloged and described in manuals or other sources." *Id.* at § 207(c)(2). Types of work that do not require the exercise of discretion and independent judgment include clerical or secretarial work, highly technical and mechanical operations, and other routine work. *Id*. at §§ 207(c)(5), (c)(7), (d)(2).

In addition to the job duties previously listed, Hamby states that her position required her "to be there for the parent twenty-four-hours-a-day, seven-days per week by telephone or in person when the family was in crisis due to an episode involving the child or to assist with a temporary lack of resources, help the parent learn how to cope with and assert themselves with the courts, social services, professionals, doctors, and the educational system." Based on Hamby's description of her position, she was required to counsel and advise her client families making, as the district court accurately described, "game-time" decisions in order to provide support to her client families and to promote ACT's goal of helping the mentally ill. In this employment position, Hamby exercised discretion and independent judgment when helping the client families. Therefore, Hamby qualifies for the administrative exemption under the FLSA because

her work directly related to management policies or general business operations of ACT and she exercised discretion and independent judgment in her position as a family advocate.

As the district court noted, Hamby was terminated for failing to follow the communication policy, but defendants' requirement that Hamby gain prior approval of her communications does not alter the analysis. Hamby's communications with others regarding TSOC are not part of her job description, but even if they were part of her job description, an employee can exercise discretion and independent judgment even if her employment activities are reviewed by higher management. *See* 29 C.F.R. § 541.207(e)(2) (2002). Because Hamby does not qualify as an administrative employee, she is exempt from FLSA overtime coverage, and her claim under this statute fails.

### C.    FLSA Retaliation

29 U.S.C. § 215 prohibits an employer from discharging or discriminating against an employee for exercising rights under the FLSA. FLSA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir. 2004) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)). Hamby argues that she meets the first prong of the *McDonnell Douglas* test because she has established a *prima facie* case of retaliation by showing that (1) she engaged in protected activity when she filed a claim for overtime wages on April 6, 2004; (2) she suffered an adverse employment action when she was

terminated on April 15, 2004; and (3) there is a casual connection based on the temporal proximity between the protected activity and the adverse employment action. The district court failed to apply the *McDonnell Douglas* burden-shifting analysis and simply found that "[t]he record shows, overwhelmingly, that Plaintiff was terminated because she violated legitimate directives of her supervisors and thereby jeopardized TSOC's ability to effectively serve its clientele." Aplt. App. at 574.

Applying the appropriate analysis to Hamby's claim, we nevertheless affirm the district court's grant of summary judgment. We agree with Hamby that she has established a *prima facie* case of retaliation. Hamby engaged in protected activity when she filed her claim for overtime wages on April 7, 2004, and she suffered an adverse employment action when she was terminated eight days later on April 15, 2004. The temporal proximity between the protected activity and the adverse employment action is sufficient to establish a casual connection to make out a *prima facie* case of retaliation. *Compare Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (six-week time period between protected conduct and adverse employment action was sufficient to satisfy the causation prong to establish a *prima facie* case) *with Richmond*, 120 F.3d at 209 (holding that three-month period of time between protected activity and termination was insufficient to establish a casual connection).

The burden then shifts to defendants to offer a legitimate non-retaliatory reason for the adverse employment action. *Pacheco*, 365 F.3d at 1207. As stated above, Hamby was terminated for a legitimate reason—disclosing a potential client's

confidential information after being repeatedly instructed to clear all external communications regarding TSOC business through her supervisor. The burden then shifts back to Hamby to show that the proffered reason for her termination was pretext for retaliation. *Id.* The Court has previously addressed all of Hamby's allegations of pretext, and has determined that she has not demonstrated any weaknesses or implausibilities in defendants' reason for terminating her employment. Hamby has not presented "any evidence on which a reasonable jury could infer retaliatory motive or disbelieve Defendants' proffered reason for terminating her employment." *Id.* Therefore, because Hamby has failed to establish pretext, her claim for FLSA retaliation cannot survive summary judgment.

### D.     Violation of 42 U.S.C. § 1985

42 U.S.C. § 1985(3) provides:

> If two or more persons . . . conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . or cause to be done, any act in furtherance of the object of such conspiracy . . . the party so injured or deprived may have an action for the recovery of damages . . . .

To establish a claim under this statute, a plaintiff must show: (1) a conspiracy; (2) to deprive a person of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) a resulting injury or deprivation. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S. Ct. 1790, 1798–99, 29 L. Ed. 2d 338 (1971). Section 1985(3) "does not 'apply to all tortious, conspiratorial interferences with the rights of others,' but rather only to conspiracies motivated by 'some racial, or perhaps

otherwise class-based, invidiously discriminatory animus.'" *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (citing *Griffin*, 403 U.S. at 102, 91 S. Ct. at 1798).

Hamby alleges that Haws, in his individual and official capacity, and Marks and Blankenship, in their official capacities, violated 42 U.S.C. § 1985 by conspiring to deprive Hamby of her First Amendment rights. We agree with the district court that because Hamby cannot provide evidence of a conspiracy, her claim under this statute fails.[15]

To support her conspiracy argument, Hamby alleges that the ODMH brought pressure on ACT to silence Hamby's policy discussions in Washington, D.C. She argues that the state was concerned that her efforts in Washington, D.C. would make Oklahoma look bad, and therefore the state pressured ACT into advising Hamby that she could face termination. To support these claims, Hamby provides an unofficial transcript that purports to document a meeting between Hamby, Haws, and Blankenship on November 26, 2003. In this meeting, the participants addressed the policy discussions that Hamby had with federal SOC staff in Washington, D.C., but there is no evidence of a conspiracy to silence her. Rather, in this meeting, Blankenship discussed his concerns that Hamby complained about Haws to the federal SOC staff. Previously,

---

[15]Defendants argue that because Hamby is not a member of a protected class, she cannot bring a claim under 42 U.S.C. § 1985. However, Hamby argues that she is a member of a protected class because she is a parent of a mentally ill child and she is associated with mentally ill people. The "'class-based animus' language . . . has been narrowly construed." *Tilton*, 6 F.3d at 686 (citation omitted). Because Hamby has failed to show evidence of a conspiracy to support her § 1985 claim, we need not address whether the conspiracy was motivated by some racial or class-based discriminatory animus.

Hamby had been disciplined for disregarding the management system by complaining about her supervisors and coworkers, and she had been repeatedly told that she was not to complain about her supervisors to others, but rather she was to "vent" to authorized persons. This meeting appears to be another attempt to remind Hamby that she was not to complain about TSOC internal business outside of TSOC. There is no evidence of a conspiracy to silence Hamby's policy discussions, nor any other communications that did not entail personnel matters.

Hamby also contends that Schneider's discussion with other state employees regarding Hamby's telephone call is evidence of a conspiracy. Hamby alleges that they discussed how to handle the matter "quickly and appropriately" so that Hamby would not talk to legislators during the appropriations session. However, the record shows that Schneider's discussions with other state officials concerned Hamby divulging confidential information about a potential client without approval from her supervisors. Although Schneider acknowledged that Hamby's actions could be damaging to TSOC, there is no evidence of a conspiracy to silence Hamby.

Finally, Hamby argues that the policy that Haws was to approve all emails is evidence of a conspiracy to silence her. But the evidence shows that Hamby had been repeatedly reprimanded for making improper communications to people outside TSOC. The policy that emails were to be approved before dissemination is not evidence of a conspiracy to silence Hamby, but rather it shows TSOC's attempts at limiting Hamby's improper communications. Further, the February 23, 2004 memorandum describing the

communication policy was distributed to all staff. There is no evidence that this policy was a conspiracy designed to silence Hamby when the policy applied to every TSOC staff member, not just to Hamby.

We recognize that "[d]irect evidence of a conspiracy is rarely available, and the existence of a conspiracy must usually be inferred from the circumstances." *Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980) (citing *Loew's, Inc. v. Cinema Amusements*, 210 F.2d 86, 93 (10th Cir. 1954)). But a plaintiff must bring forth "more than mere conclusory allegations" to establish a claim under § 1985. *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994). In this case, Hamby has failed to provide evidence, either direct or circumstantial, of a conspiracy. Therefore, the district court properly granted summary judgment as to Hamby's § 1985 claim.

### E. Public Policy Tort

The Oklahoma Supreme Court has held that "circumstances which present an actionable tort claim under Oklahoma law [occur] where an employee is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." *Burk v. K-Mart Corp.*, 770 P.2d 24, 29 (Okla. 1989). Hamby argues that defendants' attempts to limit her speech violated the policy of the SOC's Best Practice Model which promotes the interests and concerns of mentally ill children and their families through delivery and management of services. Initially, the Court notes that it is uncertain whether Oklahoma courts would recognize the SOC Best Practice Model as a clear and

-30-

compelling public policy under Oklahoma law. A public policy tort claim is actionable when an employee's discharge is "contrary to a clear mandate of public policy." *Burk*, 770 P.2d at 29; *see e.g.*, *Groce v. Foster*, 880 P.2d 902, 905 (Okla. 1994) (holding public policy tort was actionable when an employer fired injured an employee who had tried to collect workers' compensation as well as bring an action against the contractor); *Sargent v. Cent. Nat'l Bank & Trust Co.*, 809 P.2d 1298, 1301 (Okla. 1991) (finding public policy tort when employee was terminated for refusing to destroy a report in violation of statute); *Vannerson v. Bd. of Regents of Univ. of Okla.*, 784 P.2d 1053, 1055 (Okla. 1989) (holding employee could bring public policy claim if he could show that he was terminated for alleging that his supervisor made an illegal disposition of state-owned property); *Todd v. Frank's Towing Serv., Inc.*, 784 P.2d 47, 50 (Okla. 1989) (finding public policy tort when employee was fired for refusing to drive a vehicle with faulty brakes and headlights).

However, even if Hamby could establish that the SOC Best Practice Model is a compelling public policy under Oklahoma law, she cannot show that she was terminated for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with the SOC Best Practice Model. As explained above, the evidence shows that Hamby was terminated when ACT learned that she had failed to clear an external communication with her supervisor when she telephoned Schneider and divulged confidential information. Additionally, as the district court found, the requirement that Hamby clear external communications did not violate the SOC Best

Practice Model, but rather this requirement appears to further the interests of the clients by protecting private information and preventing the creation of a hostile work environment. Therefore, we affirm the district court's summary judgment ruling in favor of defendants on Hamby's public policy tort claim.

### F.  Intentional Infliction of Emotional Distress

To support a claim for intentional infliction of emotional distress under Oklahoma law, Hamby must show that she suffered "extreme and outrageous conduct coupled with severe emotional distress." *Gaylord Entm't Co. v. Thompson*, 958 P.2d 128, 149 (Okla. 1998). The Oklahoma Supreme Court recognizes that this action is governed by narrow standards and explains that "[c]onduct which, though unreasonable, is neither 'beyond all possible bounds of decency' in the setting in which it occurred, nor is one that can be 'regarded as utterly intolerable in a civilized community' falls short of having actionable quality." *Id.* (quoting Restatement (Second) of Torts § 46). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Dubbs v. Head Start Inc.*, 336 F.3d 1194, 1218 (10th Cir. 2003) (citing *Franks v. Mayberry*, 985 P.2d 773, 776 (Okla. 1999) (quoting Restatement (Second) of Torts § 46, cmt. d)).

Hamby alleges that Haws verbally assaulted her on a number of occasions, and these incidents caused her to suffer high blood pressure, anxiety, and depression. We agree with the district court that even if true, Hamby's allegations are inadequate to

support a claim for intentional infliction of emotional harm because there is nothing in the record to show that Haws' actions rise to the level of extreme outrageousness required to support a claim for intentional infliction of emotional distress under Oklahoma law.

## III.     Conclusion

For the foregoing reasons, we affirm the judgment of the district court granting summary judgment in favor of defendants on all of the preceding claims asserted by Hamby.

Entered for the Court

Julie A. Robinson
District Judge